UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| AGDIA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-075 JD |
| | ) | |
| JUN QIANG XIA and AC DIAGNOSTICS, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a trademark infringement action over two marks owned by Agdia Inc. ("Agdia" or "Plaintiff"). Dr. Jun Qiang Xia owns and operates a company that directly competes with Agdia in the field of plant diagnostic products and services: AC Diagnostics, Inc. ("ACD"). Plaintiff alleges that Defendants placed one of its marks – the Agdia mark – in white-on-white text on over 200 URL pages within ACD's website in order to divert search engine traffic.[1] Plaintiff also alleges Defendants infringed upon the Agdia mark by selecting a domain name for ACD's website that is confusingly similar to the Agdia mark itself. Lastly, Plaintiff alleges that Defendants made unauthorized use of its ImmunoStrip mark to describe their products on ACD's website.

Discovery has now closed and Defendants moved for summary judgment on Plaintiff's Counts I-V on July 1, 2016. [DE 37] The matter has been fully briefed and is ripe for review. For the reasons discussed herein, Defendants' motion is denied.

---

[1] White-on-white text is a form of metatag or metadata that matches the color of a webpage's background, thereby rendering it invisible to the naked eye. It remains visible, however, to search engine technology that reads the text in response to the terms entered into the search engine by the user.

**STANDARD OF REVIEW**

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

**FACTUAL BACKGROUND**

Agdia Inc., based in Elkhart, Indiana, provides plant diagnostic products and services to customers around the world. [DE 39-1, Affidavit of Baziel Vrient ¶ 3] It owns the two trademarks at issue here, the "Agdia" mark and the "ImmunoStrip" mark. *Id.* ¶¶ 7, 23. Defendant Dr. Jun Q. Xia worked as an employee for Agdia in the late 1990s and early 2000s, along with his wife. *Id.* ¶ 4. He and his wife were forced to resign from Agdia in 2001 after it was discovered that they had engaged in prohibited competitive activities during their employ. *Id.* Around that same time, Dr. Xia attempted to compete with his former employer in violation of his non-compete obligations, and formed a company known as Advanced Diagnostics

International LLC ("ADI"). *Id.* ¶ 5; *see also* Case No. 3:01-cv-0781. Agdia sued Dr. Xia to enforce those obligations and to prevent Dr. Xia from misappropriating Agdia's trade secrets; the lawsuit resulted in a permanent injunction being entered against Dr. Xia and ADI. *Id.*

In 2004, Xia formed ACD, also named as a defendant herein. [DE 38-9 at 47:20-23] Like Agdia, ACD develops and sells agricultural diagnostic products and related testing services, and thus it competes with Agdia in the marketplace. [DE 39-1, Affidavit of Keith Schuetz, ¶¶ 4, 15] Defendants maintain a website for ACD and Dr. Xia claims that he used the volunteer services of some of his friends' children to assist him with setting up that site. [DE 38-9 at 48:25-49:5] Dr. Xia also maintains that Plaintiff's former president, Chester Sutula, approved of ACD's domain name – "www.acdiainc.com" – during a verbal conversation held between them. [DE 38-9 at 88:15-24] Mr. Sutula denies this. [DE 39-1, Affidavit of Chester Sutula ¶¶ 8-9]

Sometime between June 24 and August 3, 2007, Plaintiff's Agdia mark was added to ACD's website, without permission, in the form of white-on-white text. [DE 38-5 at 5; DE 38-9 at 98:13-17] Based on Plaintiff's own investigation, the Agdia mark appeared on over 200 URL pages within the website, many of which displayed certain ACD products that competed directly with Plaintiff's own. [DE 39-1, Schuetz Aff. ¶¶ 7, 9-14] According to Plaintiff's expert, Mr. Mohl, the use of white-on-white text was a common practice associated with search engine optimization ("SEO") in 2007, when the Agdia mark began showing up on ACD's website.[2] [DE 38-5 at 5]. Indeed, this practice proved effective for Defendants as recently as January 2015.[3] [DE 39-1, Affidavit of Marcos Amato ¶¶ 6-11]

---

[2] Search engine optimization is the practice of maximizing the number of visitors to a particular website by ensuring that the site appears high on the list of results returned by a search engine.

[3] Plaintiff's president, Baziel Vrient, also attested that he had been directed to ACD's website after running a search in July 2016. [DE 39-1, Vrient Aff. ¶¶ 14-16] However, unlike the information provided by Mr. Amato, Mr. Vrient's statement contains no indication of how effective the search was in directing

3

The ACD website also displayed and used the ImmunoStrip mark to describe ACD's products that had a function similar to Agdia's own ImmunoStrip products – this time making open use of the mark in plain view rather than burying it in white-on-white text. [DE 39-1, Vrient Aff. ¶¶ 24-25] Dr. Xia stated in his deposition that the ImmunoStrip label was placed on ACD's website because the term was "very popular." [DE 38-9 at 112:4-10] As with the Agdia mark, this was done without permission. *Id.* at 115:24-116:7.

It is against the backdrop of these facts that the Court analyzes the issues at hand.

## DISCUSSION

Plaintiff alleges five Counts in total, for trademark infringement (I), unfair competition (II), and cyberpiracy (III) under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(d), and for Indiana state common law claims of unfair competition (IV) and infringement (V). [DE 21] The only substantive issue raised by the parties in their papers revolves around whether Defendants' use of Plaintiff's marks and the selection of the ACD domain name created a likelihood of confusion. Thus, the Court will confine its analysis to whether the evidence is so one-sided in favor of Defendants, that no reasonable jury could conclude that their alleged conduct created a likelihood of confusion with Plaintiff's marks.

To succeed, Agdia's claims rely on the presence of a likelihood of confusion between its own marks and Defendants' use of the marks. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001); *see also AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir. 1993). A weighing of the following seven factors determines whether consumers are likely to be confused:

(1) the similarity between the marks in appearance and suggestion;

---

him to ACD's website, i.e., how high it appeared on the list returned by the search engine. [DE 39-1, Vrient Aff.]

(2) the similarity of the products;

(3) the area and manner of concurrent use;

(4) the degree and care likely to be exercised by consumers;

(5) the strength of the plaintiff's mark;

(6) any actual confusion; and

(7) the intent of the defendant to "palm off" his product as that of another.

*Packman v. Chicago Tribune Co.,* 267 F.3d 628, 642 (7th Cir. 2001).[4] "No single factor is dispositive. Courts may assign varying weight to each of the factors depending on the facts presented, though usually the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (citing *id.*).

Whether consumers are likely to be confused about the origin of a defendant's products or services is ultimately a question of fact. *McGraw-Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1167 (7th Cir. 1986); *see also Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000); *Reed-Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 912 (7th Cir. 1996).

---

[4] Defendants repeatedly argue against the application of this Circuit's seven-factor likelihood of confusion test because customers never "saw" the white-on-white text with their naked eyes. This argument fails. First, to say that the white-on-white text was totally invisible to customers is somewhat inaccurate. Plaintiff notes that, when pages containing this text are printed on paper, or even when a computer user performs a "Control + F" find function on the webpage, the white-on-white text indeed reveals itself [DE 39-1, Vrient Aff. ¶¶ 16-17, Exh. 1, Amato Aff. ¶ 12]. Second, the white-on-white text, a type of metatag, need not be visible to the naked eye in order to have its intended effect; clearly it is visible to the public via search engine technology that directs potential customers to various websites. Defendants offer no substantive authority to support their invisibility theory, and the few cases they do cite miss the mark. *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F. 3d 400, 409 (2d Cir. 2005) (addressing a company's *internal* use of a trademark without communicating it to the public); *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, (C.D. Cal. 1984) (addressing issue of whether *defendants* had access to the work they allegedly copied). Regardless, this Circuit has on several occasions confirmed the application of this test to cases involving metadata, metatags, etc. *See, e.g.*, *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002), *as amended* (Oct. 18, 2002); *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456 (7th Cir. 2000).

That question of fact may be resolved on summary judgment only "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Packman,* 267 F.3d at 637 (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 171 (7th Cir. 1996)). In this case, a review of the record indicates that the evidence is not so one-sided that the issue of likelihood of confusion can be properly determined at the summary judgment stage.

### 1. Similarity of the marks.

To determine whether two marks are similar, the marks must be viewed as a whole. *See Estate of Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-46, 40 S. Ct. 414, 64 L. Ed. 705 (1920) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail."); *see also Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985). The Court must compare the marks "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (quoting *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)). "[T]he test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976). The Court should therefore "consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993).

Plaintiff alleges that Defendants openly displayed the ImmunoStrip mark, unaltered, on the ACD website to describe products offered for sale. [DE 21 ¶¶ 25-28]. The record reflects as

much and Defendants admit to this conduct. [DE 39-1, Vrient Aff. ¶¶ 24-25; DE 38-9 at 110:19-113:4; 115:24-116:7] Thus, there is no question as to similarity for the ImmunoStrip mark.

As for the Agdia mark, Plaintiff alleges Defendants engaged in infringement in two ways: (1) by including the exact word, "Agdia," in white-on-white text on hundreds of pages within the ACD website; and (2) by intentionally choosing a domain name so similar to "www.agdia.com" as to create confusion among potential consumers. Like the ImmunoStrip mark, the record reflects that Defendants placed the Agdia mark on ACD's website, this time in white-on-white text on hundreds of pages. [DE 21-5]. Again, this was done without any alteration to the Agdia mark itself. Defendants do not dispute this.

The second theory of infringement merits deeper discussion. Plaintiff alleges that ACD's domain name is confusingly similar to the Agdia mark, and that Defendants created this domain name with the intent to mislead consumers and profit from said mark. To start, the Court can peel away the "www" prefix and the ".com" suffix from ACD's domain name as they are not important to the likelihood of confusion analysis. *See TCPIP Holding Co., Inc. v. Haar Commcn's Inc.*, 244 F.3d 88, 101-02 (2nd Cir. 2001); *Brookfield Commcn's, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999). The Court is then left with a comparison between "Agdia" and "acdiainc."[5]

The domain name at issue, acdiainc, includes "inc" presumably to represent the shorthand for "incorporated," as ACD's full name is AC Diagnostics, Inc. But because many companies use shorthand corporate designations in their names, such as "Inc." or "Co.," the addition of "inc" here to the back end of ACD's domain name is of diminished importance in distinguishing the domain name from the Agdia mark. When comparing Agdia with acdia, the two are similar

---

[5] The Court also notes that capitalization and spacing are irrelevant when comparing trade names to allegedly infringing domain names. *See TCPIP*, 244 F.3d at 101-102.

in appearance, differing in spelling by only one letter. And, as noted by Plaintiff, when spoken aloud, the two are nearly indistinguishable. *See NFE Intern., Ltd. V. Gen. Res. Corp.*, 558 F. Supp. 1137, 1140 (N.D. Ill. 1983) ("Similarity in the sound of trademarks enters into a consideration of likelihood of confusion.").

In the context of their competing products and services and the shared marketplace in which Plaintiff and ACD operate, one can easily contemplate a scenario in which a prospective consumer acts on a referral from a colleague or a radio advertisement pointing him or her to Agdia's website, but ends up at ACD's website due to mishearing the pronounced name. Moreover, the fact that "Agdia" and "acdia" are so similarly spelled only enhances the likelihood that a consumer might misspell one for the other and thus be led to the other's website. Accordingly, when considering the facts in favor of the nonmovant, a reasonable factfinder could determine that the similarity between the Agdia mark and ACD's domain name weighs in favor of likelihood of confusion.

### 2. Similarity of the products.

Like the previous factor comparing the similarity of the marks, the Court's "inquiry in comparing the two products is not whether they are interchangeable, but whether 'the parties' products are the kind the public might very well attribute to a single source (the plaintiff).'" *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000) (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir.1988)); *see also McGraw-Edison Co.*, 787 F.2d at 1169. "The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer." *AutoZone*, 543 F.3d at 931.

Here, the parties directly compete with one another in the marketplace by offering the plant diagnostic products and testing services. [DE 38-9 at 57:10-16; DE 39-1, Vrient Aff. ¶ 6, Schuetz Aff. ¶ 15] Given Defendants' explicit use of the ImmunoStrip mark to describe some of their products and the inclusion of the Agdia mark in white-on-white text on more than 200 URL pages within ACD's website [DE 21-5; DE 21-6; DE 39-1, Vrient Aff. ¶ 25], a reasonable factfinder, taking into account ACD's use of Plaintiff's marks and the domain name of ACD's website, could conclude that the goods are attributable to a single source.

### 3. Area and manner of concurrent use.

"The third factor in the likelihood of confusion analysis assesses 'whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *CAE, Inc.*, 267 F.3d at 681 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). In this case, both parties operate in the plant diagnostics industry and promote and offer their goods online. Because users can easily navigate through websites, as opposed to physical store locations, it is "more likely" that consumers will "be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1042-43 (N.D. Ill. 2001) (quoting *Brookfield*, 174 F.3d at 1057). Moreover, the parties employ similar marketing practices, namely appearing at the same trade shows specific to the plant diagnostics industry. [DE 39-1, Vrient Aff. ¶ 6] *See Forum*, 903 F.2d at 441-42 (concurrent use existed when both parties marketed and sold products through, among other things, attendance at the same trade show). A reasonable factfinder could determine that the parties' overlap in industry-related marketing weighs in favor of likelihood of confusion.

### 4. Degree of consumer care.

Relevant to analyzing the degree of care likely to be exercised by consumers are the cost and availability of the products sold. The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *CAE*, 267 F.3d at 683; *see also Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985) (stating that the simplicity and negligible cost of Fuji's goods and its extensive advertising increased the likelihood of confusion about the source of the goods). Here, the goods and services offered by both Plaintiff and ACD are not so widely accessible that an ordinary consumer would find them on a shelf in Walmart. Instead, the entities offer rather nuanced agricultural products and services. [DE 39-1, Vrient Aff. ¶ 3; DE 38-9 at 57:10-16]. And, based on the limited information provided regarding these items' cost, they appear to be relatively expensive; many of ACD's products, for example, are offered for several hundreds of dollars per packages weighing no more than a few pounds. [DE 21-6; DE 21-7]

The Court must also consider both parties' potential customers, because the Lanham Act "clearly encompasses confusion on the part of purchasers of *either* (or both) party's products." *CAE*, 267 F.3d at 682 (quoting *Fuji Photo Film*, 754 F.2d at 596). Defendants assert that their clientele is relatively sophisticated; those who seek ACD's plant testing diagnostic test services or reagent kits include mostly PhD's, technicians, and researchers. [DE 38-9 at 130:17-131:5] While little is proffered about the identities of Plaintiff's customers, the Court will indulge in the assumption that they are much like those of Defendants, as both Agdia and ACD provide plant diagnostic products and services that "directly compete" in that market.

While many of the parties' customers are no doubt well-accomplished in their respective fields, "technical sophistication about their particular industry does not equate to trademark sophistication." *CAE*, 267 F.3d at 683 (citing *Fuji Photo Film*, 754 F.2d at 595). In other words, while accomplished in the area of agricultural science, that does not automatically make these customers website coding experts nor instill in them the ability to identify whether their internet searches are yielding manipulated results. Even Plaintiff's expert noted in his deposition:

> [I]t's a bit of a leap to assume that someone with a strong educational background inherently has a better ability to discern one website from another or they're necessarily more literate than someone with less education when it comes to website literacy, you know, when it comes to computers and using the web.

[DE 38-6 at 63:9-16]. In addition, given that the parties directly compete with one another and that their products and services overlap, it is more likely that "even an informed and sophisticated consumer will mistakenly attribute the parties' products and services to a common source." *CAE*, 267 F.3d at 683. Genuine issues of material fact exist as to this factor.

### 5. Strength of the plaintiff's mark.

"The stronger the mark, the more likely it is that encroachment on it will produce confusion." 2 McCarthy § 11.73, at 11-169 to 170 (2008) (quoting *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111 (6th Cir. 1996)). "The strength of the mark usually corresponds to its economic and marketing strength." *AutoZone*, 543 F.3d at 933 (citing *Sullivan* 385 F.3d at 777). In addition, trademark law recognizes five categories of trademarks, in ascending order of distinctiveness and with more strength attributed to the more distinctive marks: generic, descriptive, suggestive, arbitrary, and fanciful. *CAE*, 267 F.3d at 684; *Morningware, Inc. v. Hearthware Home Prod., Inc.*, No. 09 C 4348, 2012 WL 3721350, at *11 n. 10 (N.D. Ill. Aug. 27, 2012).

Plaintiff briefly argues that "[t]he strength of Agdia's mark is quite high because it is a fanciful word that has no meaning independent of the trademark." [DE 39 at 12] A reasonable trier of fact could interpret this as indicative of the strength of both of Plaintiff's marks – indeed, "Agdia" and "ImmunoStrip" are meaningless words outside of their trademark status, and the Court has been presented with no evidence or argument to the contrary. Further, Plaintiff has used the Agdia mark since 1981 and had it registered in 1993, and has also used the ImmunoStrip mark since 2000, registering it in 2006. [DE 39-1, Vrient Aff. ¶¶ 7, 23; DE 21-2] Plaintiff's ImmunoStrip mark has thus been registered (and used) for a relatively short period of time, which could be interpreted by a jury as diminishing of its purported strength; Plaintiff's history of use and registration for its Agdia mark, however, is much more significant, and could be considered a testament to its strength by a factfinder. *See CAE*, 267 F.2d at 686 (finding district court correctly weighed plaintiff's 40-year use of its mark as indicative of the mark's strength); *Top Tobacco v. Fantasia Distribution, Inc.*, 101 F. Supp. 3d 783, 791 (N.D. Ill. 2015) (strength of plaintiff's mark weighed in favor of likelihood of confusion where mark had been registered to plaintiff for more than 20 years); *cf. Poneman v. Nike, Inc.*, 161 F. Supp. 3d 619, 629-30 (N.D. Ill. 2016) (senior user's unregistered mark not strong when used only two years prior to junior user's manufacturing and sale of merchandise displaying said mark).

Nothing has been presented as to the economic and marketing strength of either mark at issue. Plaintiff has offered no evidence that would weigh in favor of its marks, such as information as to total sales associated with the marks, the frequency with which it advertises its marks, or the amount of money it spends on their advertisement. *Cf. AutoZone*, 543 F.3d at 933 (evidence supported a finding in favor of the mark's economic and marketing strength where it "is displayed prominently on more than 3,000 stores nationwide and it has been the subject of

hundreds of millions of dollars' worth of advertising since 1987"); *see also Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 832 (C.D. Ill. 2009) ("evidence of the frequency of a mark's display and the amount of advertising dollars used to promote the mark are relevant factors when determining a mark's strength").

Thus, viewing the facts in favor of the nonmovant, a reasonable factfinder could determine that the strength in Plaintiff's marks weighs in favor of likelihood of confusion.

### 6. Actual confusion.

Defendants largely argue throughout their papers that summary judgment should issue because there is no evidence to support a finding that consumers were actually confused by Defendants' use of Plaintiff's marks. Plaintiff counters by arguing initial interest confusion.[6] Initial interest confusion as to trademark occurs when a customer is lured to a product by defendant's use of the same or similar mark belonging to plaintiff, and may be consummated even if the consumer realizes the true source of the goods before purchasing them. *See Wolf Appliance, Inc. v. Viking Range Corp.*, 686 F. Supp. 2d 878, 890-91 (W.D. Wisc. 2010).

Asserting initial interest confusion does not alter the likelihood of confusion analysis. More specifically, to create an issue of fact here as to whether there was any actual confusion, the record must contain evidence that initial interest confusion actually occurred – not merely theories that would create a *risk* of initial interest confusion. *See Eli Lilly*, 233 F.3d at 465. Such evidence might come in the form of a consumer survey, although that survey would not be

---

[6] Defendants note that Plaintiff's initial interest confusion theory made its first appearance in its Response in Opposition. [DE 40 at 2] However, the argument for initial interest confusion, while not initially pled by Plaintiff, is sufficiently set forth in the facts alleged. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698 (7th Cir. 2014) ("Plaintiffs need only plead facts, not legal theories, in their complaints.").

limited to a sampling of ACD's customers, because initial interest confusion is complete prior to any transaction. *Id.*

This Circuit has examined the initial interest theory with regard to metatag cases. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812-13 (7th Cir. 2002); *Eli Lilly*, 233 F.3d at 464-65. In such cases, the confusion can occur either when a consumer is diverted to a defendant's webpage, or when the consumer's search engine results are first displayed. *See Promatek*, 300 F.3d at 812 (explaining that consumers who are diverted to a defendant's website experience initial interest confusion even if they are no longer confused once they reach that webpage); *Morningware*, 2012 WL 3721350, at *9 ("the relevant focus is the degree of care a consumer uses when deciding on which link to click after the search results are displayed on the webpage, as that is the point at which consumer confusion can occur").

Here, Plaintiff has presented evidence of a search engine user being diverted to ACD's website upon running a Google search for an Agdia product in January 2015. [DE 39-1, Amato Aff. ¶¶ 6-11] ACD's website showed up on the second page of a search yielding over 1,000 results. *Id.* at Exh. 1. Thus, a reasonable factfinder could determine that initial interest confusion actually occurred related to the Agdia mark. Defendants criticize this search because the individual was an employee of a French distributor of Agdia products, and not a consumer. The record does not contain enough information about the two companies that would rule out his role as a consumer, but even if it did, there is no evidence to suggest that a consumer who entered "AGDIA CGMMV ELISA" into Google in January 2015 would experience any different results. [DE 39-1, Amato Aff. ¶ 6]

As to the ImmunoStrip mark, Plaintiff has presented evidence that actual confusion occurred. Oklahoma State University published a document online listing ACD as a supplier of

14

Agdia's ImmunoStrip test kit. [DE 39-1, Vrient Aff., Exh. 2] Plaintiff never authorized ACD to use the ImmunoStrip name in connection with its products, and thus, a reasonable factfinder could infer that the confusion evidenced by Oklahoma State's publication came from Defendants' unauthorized use of the mark on ACD's website, which they do not dispute. [DE 38-9 at 112:4-22, 116:3-7]

The Court notes that even a record completely lacking in evidence of actual confusion does not provide a magic bullet for Defendants. It is well-established that, while evidence of actual confusion is an important factor, it "is not essential to a finding of likelihood of confusion." *Eli Lilly*, 233 F.3d at 465 (citing *Computer Care v. Service Sys. Enter., Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992)). Here, however, reviewing the facts in favor of the non-movant, a reasonable factfinder could determine that actual confusion occurred with regard to the marks.

**7. Intent of the defendants to palm off.**

A genuine issue of material fact remains as to Defendants' intent in using the Agdia and ImmunoStrip marks on its website and in choosing the domain name "acdiainc." At his deposition, Dr. Xia admitted that no one gave him permission to use the Agdia mark on ACD's website, [DE 38-9 at 98:13-17], but his general story is that he had nothing to do with the mark's presence because he used volunteer college students, mostly children of some of his friends, who had knowledge of website programming to set up a website for his first company, ADI, in 2000. *Id.* at 48:25-49:5. Dr. Xia could not remember any of these individuals' names. *Id.* According to Dr. Xia, in 2004, he used the information from the first website to form ACD's using additional volunteers "every now and then" for additional assistance. *Id.* at 51:5-52:2. However, Plaintiff's expert, Mr. Mohl, reported that the Agdia mark started showing up on the ACD website between June 24 and August 3, 2007, long after Xia received help from college students to set up the first

website in 2000, and about three years after he used the old website as a basis for ACD's site in 2004. [DE 38-5 at 5]

Defendants' expert, Mr. Mahler, testified that the Agdia mark's appearance in the white-on-text might have been a typo because "Agdia" is only one letter removed from "ACDia." [DE 38-10 at 36:6-11] Mr. Mahler further opined that the white-on-white text could be attributed to poor programming practice because the website's source code was surrounded by a font tag that had been out of date for at least ten years, suggesting incompetence on whoever constructed the website. [DE 38-10 at 39:1-13, 40:7-15] But Mr. Mahler provided that explanation at his deposition in April 2016, and so the method he referenced might not be considered so outdated in 2007, when the white-on-white text was added to the website.

In determining that the Agdia mark was included in white-on-white text to improve search engine result rankings, Plaintiff's expert also noted the above timeline discrepancy, albeit with regard to search engine manipulation rather than font tags: "Though [using white-on-white text] is no longer a common practice for SEO today, it was much more common when the text was added to some pages in 2007." [DE 38-5 at 5] Further, he determined that the white-on-white text was intentionally formatted to evade consumers' eyes while remaining visible to "web crawlers" that view the code, and that the words in the hidden text were chosen specifically for their relation to products and services offered by ACD. *Id.* at 5-6. Defendants' expert confirmed that search engine manipulation is connected with this practice of using white-on-white text. [DE 38:10 at 41:8-12] Placing Plaintiff's mark in the ACD website's metatags made it visible to search engine technology while hiding it from consumers, and this qualifies as "significant evidence of intent to confuse and mislead." *Eli Lilly*, 233 F.3d at 465 (citing *Brookfield*, 174 F.3d at 1062).

As for the ImmunoStrip mark, Dr. Xia testified that it was originally added to the ACD website because the word "ImmunoStrip" was "very popular." [DE 38-9 at 112:4-11] Defendants did not have permission to place "ImmunoStrip" on ACD's website. [DE 38-9 at 116:3-7] According to Dr. Xia, he directed his employees to remove the mark once Plaintiff warned him of its status as a registered trademark and asked him to take it down in or around 2012-2013. [DE 38-9 at 112:11-22] But, he could not then explain why the ImmunoStrip mark remained on the ACD website several years after Plaintiff contacted him about it. *Id.*

Dr. Xia testified that he had obtained express permission from Agdia's president, Chester Sutula, to use "acdiainc" as his company's domain name. [DE 38-9 at 88:15-24] However, Mr. Sutula flatly denies ever consenting to this name. [DE 39-1, Sutula Aff. ¶¶ 8-9] Evaluations of witness credibility are inappropriate at the summary judgment stage, and the Court will not engage in such determinations here. *Washington v. Haupert*, 481 F.3d 543, 549-50 (7th Cir. 2007). As to how Dr. Xia came up with the domain name, Defendants argue that "A" simply stands for "America" and "C" for "China," but Dr. Xia also testified that the "AC" combination could be interpreted as "Agriculture Chemical," or "it can interpret [sic] any way." [DE 38-9 at 87:20-25] So, the name could arbitrarily stand for anything, thus leaving questions as to *why* Dr. Xia chose *this particular* domain name.

In combination with the points above, Plaintiff questions Dr. Xia's purportedly benign intent by noting that he and his wife were forced to resign from Agdia in 2001 after it was discovered that they had engaged in prohibited competitive activities during their employ. [DE 39-1, Vrient Aff. ¶ 4] After he left the company, Dr. Xia attempted to compete with Agdia in violation of his non-compete obligations. *Id.* ¶ 5. Agdia sued Dr. Xia to enforce those obligations and to prevent Dr. Xia from misappropriating Agdia's trade secrets; the lawsuit resulted in a

permanent injunction being entered against Dr. Xia. *Id.* Additionally, Plaintiff's own investigation of the ACD website, conducted toward the end of the relevant time period, revealed that more than 200 of the site's URL pages contained "Agdia" in white-on-white text. [DE 39-1, Schuetz Aff. ¶ 7] And, the placement of that text appears to correspond with URL pages of competing products, offered by both ACD and Plaintiff. *Id.* ¶¶ 9-14. Based on the above, a reasonable factfinder could find that Defendants' intent weighs in favor of likelihood of confusion.

## CONCLUSION

Based on the record before the Court, genuine issues of material fact exist pertaining to whether Defendants' conduct related to Plaintiff's marks created a likelihood of confusion. Therefore, Defendants' Motion for Summary Judgment is **DENIED**.

SO ORDERED.

ENTERED: August 10, 2017

/s/ JON E. DEGUILIO
Judge
United States District Court